Stephen A. McCartin (TX 13374700)
Mark C. Moore (TX 24074751)
Melina T. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile:  (214) 999-4667
smccartin@foley.com
mmoore@foley.com
mbales@foley.com

**PROPOSED COUNSEL TO DEBTOR**
**FRANKIE V'S KITCHEN, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FRANKIE V'S KITCHEN, LLC.** | § | **Case No.: 19-31717** |
| | § | |
| Debtor. | § | |
| | § | |

## DECLARATION OF STEVE SOLOMON
## IN SUPPORT OF FIRST-DAY MOTIONS

I, Steve Solomon, state and declare as follows:

1. I am over 18 years of age and if called upon I would competently testify to the matters set forth herein from my own personal knowledge or from knowledge gathered from others within my review of relevant documents, or my opinion based upon my experience.

2. I have recently been appointed as the Chief Restructuring Officer to Frankie V's Kitchen, LLC ("**Frankie V's**" or the "**Debtor**").

3. Based upon limited personal knowledge of the Debtor, its business operations, history, industry, and the books and records presented to me by the Debtor's current and prior management and consultants, and based upon information contained therein, I am qualified to

give this declaration (the "**First-Day Declaration**") on behalf of the Debtor.[1]

4. Some of the information presented below is based upon my limited knowledge and review of data regularly compiled by the Debtor in the ordinary course of its business.

5. I submit this Declaration in support of the following motions (collectively, the "**First-Day Motions**"). Attached hereto as **Exhibit A** is a summary of each First-Day Motion and the relief requested therein.

(i) *Motion for Order Establishing Notice Procedures and Approving Form Notice of Commencement of Cases* [Docket No. 2];

(ii) *Motion for Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "**Schedules Extension Motion**") [Docket No. 3];

(iii) *Motion for Administrative Order Under Bankruptcy Code Sections 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (the "**Interim Compensation Procedures Motion**") [Docket No. 4];

(iv) *Motion for Order (i) Deeming Utilities Adequately Assured of Future Performance; and (ii) Establishing Procedures for Determining Requests for Additional Adequate Assurance Pursuant to Bankruptcy Code Section 366* (the "**Utilities Motion**") [Docket No. 6];

(v) *Motion for Authority to (i) Pay Prepetition Insurance Obligations, (ii) Continue Administering Insurance Policies, and (iii) Continue to Pay Claims to the Extent They Become Due and Payable* (the "**Insurance Motion**") [Docket No. 7];

(vi) *Motion for Authority to Pay Prepetition Wages and Other Employee-Benefit Claims* (the *"***Prepetition Wages Motion***")* [Docket No. 8]; and,

(vii) *Motion for Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Financing; (II) Granting Liens, Security Interests and Superpriority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Modifying the Automatic Stay* (the *"***Amegy DIP Motion***")* [Docket No. 9].

---

[1] The Debtor's management is currently in the process of a forensic analysis of the Debtor's historical books and records. All statements herein are based off of the best information available to me to date and may be subject to change in the future.

# I.
# BACKGROUND

6.    On May 20, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby initiating the above-captioned bankruptcy case and creating its bankruptcy estate (the "**Estate**").

7.    The Debtor continues to operate and to manage its business as "debtor-in-possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the above-captioned bankruptcy case (the "**Chapter 11 Case**") pursuant to section 1104 of the Bankruptcy Code. No official committee of unsecured creditors has been appointed in the Chapter 11 Case at this time.

**A.**    **Description of the Debtor**

8.    The Debtor's business began with a chef creating salsas, sauces, and soups that eventually attracted customers that include, or at one point included, Dean Fearing, HEB, Central Market, Wegman's, and Walmart. Established in 2012, the Debtor's business focuses on the manufacturing of shelf-stable and fresh or refrigerated products such as soups, hot sauces, salad dressings and Pico de Gallo.

9.    The first part of the Debtor's business is straightforward. The Debtor develops or acquires a recipe for a food product, designs the manufacturing process to scale up production, and then packages and labels the product under its own brands for distribution, through distributors or directly to stores. These products include hot sauces, salsas, salad dressings and condiments, gourmet soups, and other spreads.

10.    The Debtor's experience with its own products prompted it to approach other brands seeking to scale their production, leading to the second major aspect of the Debtor's business: services focused on assisting third parties with the manufacturing and distribution of

their own recipes. The services include consulting the third party on its proposed recipes, manipulating the recipes for production, packaging the final product with the third party's branding, and ultimately, distribution. Specifically, the different categories of services include:

    a. *Private Labeling*: the Debtor develops a recipe for a third party based on their product without any third-party input other than approval, then the third party sells that product under their own branding/logo.

    b. *Co-Packing*: the Debtor manufactures and packages a recipe that a third party provides to the Debtor.

11. Though recent trends in the industry have emphasized fresh or refrigerated food products, the Debtor's ability to increase shelf life on its shelf-stable products distinguish its offerings.

**B.    The Debtor's Capital Structure.**

12. Initially the Debtor was capitalized through the sale of securities, the issuance of common stock (i.e. membership units) to approximately thirty-three (33) investors, including Jeffrey D. Franco, the Debtor's largest investor. Through his entity Agneto Holdings, LLC ("**Agneto**"), Mr. Franco owned approximately 37.85% of the common stock in the Debtor as of the Petition Date.

13. In 2018 the Debtor sought additional financing through the issuance of Series A preferred stock, the vast majority of which was purchased again by Mr. Franco through Agneto, raising his overall ownership of the Debtor (between common and preferred stock) to approximately 49.75% and his overall investment in the Debtor to more than $11 million plus guaranties. By virtue of its Series A preferred stock acquired late in the third quarter of 2018, Mr. Franco (through Agneto) began controlling three (3) of the five (5) votes on the Debtor's Board of Directors. An additional six (6) investors, some of which are related and/or affiliated with the Debtor's initial investors, purchased Series A preferred stock.

**FIRST-DAY DECLARATION OF STEVE SOLOMON**  Page 4
4839-2145-6535.4

**C.     The Pre-Petition Financing with Amegy.**

14. On April 13, 2017, Amegy agreed to loan the Debtor approximately $1,500,000 through a variable-rate revolving line of credit with an original maturity date of October 13, 2018 pursuant to a Business Loan Agreement (the "**Original Loan Agreement**"). On November 19, 2018, Amegy and the Debtor executed a Change in Terms Agreement (the "**Change in Terms Agreement**, and, together with the Original Loan Agreement and as otherwise amended, modified and restated from time to time, the "**Loan Agreements**")[2] that increased the amount of the revolving line of credit to $2,500,000 (the "**Amegy Loan**"). The prepetition Amegy Loan was guaranteed by Mr. Franco. As of the Petition Date, the Debtor owed Amegy approximately $2.5 million under the Loan Agreements (the "**Amegy Debt**"), secured by, among other assets, accounts receivable of approximately $260,000 and equipment and/or machinery with a purchase price of at least $5 million notwithstanding depreciation.

15. Amegy asserts that the Amegy Debt is secured by a first priority, properly perfected lien in substantially all of the Debtor's assets (the "**Pre-Petition Collateral**") that was perfected by filing a UCC-1 financing statement. The chart below indicates the relative priority of the liens asserted on all of the Debtor's assets, including accounts receivable, as of the Petition Date based on UCC-1 financing statements filed by various parties. Certain other parties have limited purchase money security interests in limited Debtor collateral as reflected by their filed UCC-1 financing statements.

---

[2]     The Debtor's counsel will make a copy of the Loan Agreement available upon request.

| Secured Creditor | Collateral | Asserted Priority |
|---|---|---|
| Amegy Bank | All inventory, equipment, chattel paper, accounts, and general intangibles, and all proceeds relating to any of the foregoing (including insurance, general intangibles, and accounts proceeds). | 1st on all collateral *except* where equipment lessors (listed below) hold purchase-money security interests (each a "**PMSI**") on specific pieces of equipment. |
| Ascentium Capital LLC | Specific equipment and personal property financed under/described in the specific agreement with Ascentium. | 1st priority PMSI on specific equipment and personal property. |
| Toyota Industries Commercial Finance, Inc. | Specific equipment and personal property financed under/described in the specific agreement with Toyota Industries Commercial Financial, Inc. | 1st priority PMSI on specific equipment and personal property. |
| Elmar Industries, Inc. | Specific equipment and personal property financed under/described in the specific agreement with Elmar Industries, Inc. | 1st priority PMSI on specific equipment and personal property. |

**D.    The Pre-Petition Unsecured Notes.**

16.    In addition to the Amegy Debt and general trade debt incurred in the ordinary course of its business, the Debtor also owes unsecured debt to certain parties pursuant to various loan agreements executed with those entities. The Debtor's records reflect unsecured debts owed to the noteholders set forth in the chart below:

| Lender | # of Notes | Amount |
|---|---|---|
| Lee William McNutt IV Trust | 2 | $200,000.00 |
| Thomas Max Nygaard McNutt IV Trust | 2 | $200,000.00 |
| Jeff Franco | 1 | $197,000.00 |
| Jackson Opportunity Fund III, L.P. | 3 | $661,733.30 |
| Jackson Blvd. Equities, L.P. | 2 | $300,000.00 |

| | | |
|---|---|---|
| Greg Pearl | 7 | $3,200,000.00 |
| Dianne Betts | 1 | $155,456.99 |
| Pearl Ventures | 2 | $500,000.00 |
| Agneto Holdings, LLC | 1 | $300,000.00 |
| Mike McGarry | 1 | $50,000.00 |
| **TOTAL** | **22** | **$5,764,190.29** |

### E. The Debtor's Financial Difficulties

17. The Debtor believes that the fresh and shelf-stable food-manufacturing business has a bright future; however, the Debtor has continued to post significant losses year after year. Though the Debtor's books and records reflect increased sales from $3.2 million in 2017 to approximately $5.1 million in 2018, that growth did little to offset the Debtor's overall negative performance, and the Debtor lost approximately $8.6 million in 2018 alone. Through April 30, 2019 the Debtor has lost approximately $2.5 million this calendar year, an improvement in terms of overall trend but still not good enough.

18. Ultimately, the Debtor decided to terminate Mr. Valdez in April 2019 and restructure its management team due to mismanagement as part of its continuing restructuring efforts, which include the filing of this Chapter 11 Case. Through this case, the Debtor intends to reorganize its debts and stabilize internal operations, including by potentially rejecting burdensome equipment or real-estate leases or customer and vendor contracts, in order to move forward and either sell its operations as a going concern or solicit new equity investments through a plan of reorganization.

**F.     The Debtor-in-Possession Facility with Amegy**

19.     To fund its operations post-petition, the Debtor has worked with Amegy to secure additional, new post-petition financing (the "**Amegy DIP Facility**") of approximately $1.25 million (for a total debtor-in-possession financing facility of $3.75 million, including the pre-petition amount owned to Amegy) that has been guaranteed the Debtor's largest investor, Agneto Holdings, LLC, and its principal Mr. Franco.  Based on projections prepared in advance of the Chapter 11 Case, the Debtor anticipates that it will utilize approximately $1.1 million of the availability under the line of credit to fund operations and pay administrative and restructuring expenses during the first thirteen (13) weeks of the Chapter 11 Case in which it will attempt to become cash-flow positive.

20.     The proposed Amegy DIP Facility is secured by first-priority liens on all or virtually all of the Debtor's post-petition assets excluding causes of action under Chapter 5 of the Bankruptcy Code and should allow the Debtor the time necessary to determine is strategy for restructuring its operations post-petition under the aegis of the Bankruptcy Court.  The Amegy DIP Facility has been structured as a line of credit that will be available to the Debtor, but the Debtor does not intend to draw the full amount or need additional post-petition financing during this Chapter 11 Case. The Debtor has attached a 13-week budget approved by Amegy to the Amegy DIP Motion.

## II.
## THE FIRST DAY MOTIONS

21.     Contemporaneously herewith, the Debtor has filed the First Day Motions listed above seeking orders granting various forms of relief intended to stabilize the Debtor's business operations, minimize the adverse effects of the commencement of these Chapter 11 Cases, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth

reorganization of the Debtor's balance sheets. In connection with the preparation for these bankruptcy proceedings, I have reviewed each of the First Day Motions. I believe that the entry of orders granting the relief requested in these Motions is critical to the Debtor's ability to continue in operation, and thus maximize the return to their estates and creditors.

Pursuant to 28 U.S.C. § 1746(2) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 20, 2019.

*/s/ Steve Solomon*
Steve Solomon, Chief Restructuring Officer